## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| **PHILLIPS GROUP, INC. d/b/a** | : | **Bankruptcy No. 05-23166 BM** |
| **LA RECETTE ON THE RIVERS EDGE,** | : | |
| | : | |
| **Debtor** | : | **Chapter 7** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| **NATALIE LUTZ CARDIELLO, TRUSTEE,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **Adversary No 05-3051 BM** |
| | : | |
| **PHILIP CASALE and LORRAINE** | : | |
| **CASALE, and TURAIN ENTERPRISES,** | : | |
| **INC.,** | : | |
| | : | |
| **Defendants** | : | |

Appearances:    Richard A. Finberg, Esquire for Plaintiff
                Richard R. Tarantine, Esquire for Defendants

### MEMORANDUM OPINION

The chapter 7 trustee seeks to limit the secured claim of defendants Philip Casale and Lorraine Casale to the amount of a judgment they obtained in a foreclosure action against property debtor Phillips Group, Inc. owned.  Alternatively, the chapter 7 trustee seeks in accordance with the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA") to avoid a mortgage lien in favor of the Casales to the extent that debtor did not receive reasonably equivalent value in exchange for the mortgage.

The chapter 7 trustee also seeks a determination that the claim of defendant Turain Enterprises, Inc. with respect to restaurant equipment it sold to debtor is fully unsecured.

Judgment will be entered in favor of the Casales and against the chapter 7 trustee and in favor of the chapter 7 trustee and against Turain.

## FACTS

The Casales owned real property located in Verona, Pennsylvania, on which a restaurant known as The River's Edge did business. Turain, which the Casales controlled, operated the restaurant and had a liquor license for the restaurant.

Gourmet Products, Inc. and debtor were incorporated and controlled by Thomas A. Iarrapino and T. Phillips Iarrapino. They were the sole shareholders and officers of the corporations.

Turain and Gourmet Products entered into an agreement on June 20, 2001, whereby Gourmet Products leased from Turain the first floor of the building in which the restaurant was located along with a portion of the basement. The term of the lease commenced on January 1, 2002, and was to terminate on July 31, 2012, unless the parties terminated it earlier.

The lease was contingent upon Gourmet Group purchasing Turain's liquor license for $50,000. Gourmet Group agreed to sell the license back to Turain for the same price when the above lease terminated.

Gourmet Products was granted an option to purchase the real property on which the restaurant was located along with the equipment contained therein. If Gourmet Products exercised its option during the first three years of the lease, the purchase price was $850,000.

- 2 -

In conjunction with the lease agreement, Gourmet Products entered into a separate agreement with Turain on June 20, 2001, to manage the restaurant while Gourmet Products and Turain took steps to transfer the liquor license to Gourmet Products. An addendum to the management agreement provided that Gourmet Products could assign its rights under the agreement to debtor.

Gourmet Products assigned its rights under the above agreements to debtor at some undisclosed time after June 20, 2001, but prior to April of 2002.

Debtor temporarily shut down the restaurant late in the year 2001 and renovated the property. The restaurant reopened in April of 2002 and changed its name to La Recette on the River's Edge. Turain still held the liquor license in its name for as long as La Recette remained in operation.

A flurry of transactions between debtor and the Casales and Turain occurred in January of 2004.

Debtor and the Casales executed an agreement of sale of the property on January 6, 2004. The purchase price was $820,000. Debtor agreed to pay the Casales $220,000 in cash upon executing the agreement and agreed to execute a note and mortgage in favor of the Casales in the amount of $600,000 at the closing.

That same day, debtor also executed a note in favor of the Casales in the amount of $600,000 plus interest at the rate of eight percent per annum. The principal balance was to be paid in equal monthly installments beginning on February 7, 2004. The maturity date of the note was December 7, 2019.

- 3 -

The closing on the sale of the real property took place on January 7, 2004, at which time debtor executed a mortgage in favor of the Casales in the amount of $600,000. Paragraph 24 of the mortgage provided in part as follows:

> **Waiver**. Borrower, to the extent permitted by Applicable Law, waives and releases any errors or defects in proceedings to enforce this Security Agreement.

Upon debtor's execution and delivery of the mortgage to them, the Casales executed a general warranty deed and conveyed the realty to debtor.  The recited consideration paid was $820,000.

Debtor also entered into two agreements with Turain on January 7, 2004.

In the first agreement, debtor purchased Turain's liquor license for $50,000, which it tendered in full at that time.  It was agreed that Turain's attorney would hold the amount tendered in an escrow account until transfer of the liquor license to debtor occurred.

In the event debtor failed to take steps to effectuate the transfer of the liquor license by March 30, 2004, the agreement provided that Turain could place the license for safekeeping with the Pennsylvania Liquor Control Board ("LCB") and was permitted to apply the escrowed funds to any costs it incurred in connection with the license.  Debtor further agreed that Turain had a right of first refusal with respect to a future sale of the license and would have a first priority lien on the license.

In the second agreement, Turain agreed to sell certain restaurant equipment to debtor for $30,000, which amount debtor tendered in full at that time.  Turain thereafter

- 4 -

filed a UCC-1 financing statement indicating that it had a security interest in the equipment.

Debtor defaulted soon thereafter on its obligations under the note and mortgage. It paid the installments due for February and March of 2004, but made no further payments.

When debtor failed to apply for transfer of the liquor license by March 30, 2004, Philip Casale removed the license from the restaurant and placed it with the LCB for safekeeping.

Without a liquor license on the premises, debtor was not permitted to sell alcohol in the restaurant. After "limping along" for about a month, debtor closed its doors for good early in May of 2004.

Wasting no time, the Casales commenced a foreclosure action against the property in state court on May 12, 2004. The complaint in foreclosure was inartfully drafted. Paragraph 7 of the complaint stated that the *entire* balance of principal and interest called for in the mortgage was due in light of debtor's default. Paragraph 8, however, stated that only a total of $17,042.00 in principal, interest and other costs was due at that time. In the *ad damnum* clause, the Casales requested a judgment "... in the amount due as set forth."

A judgment issued on October 12, 2004, in favor of the Casales in the amount of $30,389.67 plus interest . The order the state court issued was prepared by the law office of the Casale's attorney.

On May 17, 2005, before the property could be sold at a sheriff's sale, debtor filed a voluntary chapter 7 petition. The chapter 7 trustee was appointed the following day.

The schedules accompanying the petition listed assets with a total declared value of $1,022,057.00 and liabilities totaling $2,388,956.51.

Included among the listed assets were the above realty, liquor license and restaurant equipment. Their combined declared value was $1,018,557, approximately 99.6 percent of the total declared of debtor's assets.

The Casales were identified as having an undisputed secured claim in the amount of $67,000.00 and an undisputed general unsecured claim in the amount of $553,000. Turain was identified as having an undisputed secured claim in an "unknown" amount arising out of the above UCC-1 financing statement Turain had filed.

The Casales subsequently filed a proof of claim in which they asserted that they had a secured claim in the amount of $783,530. Attached to the claim was an appraisal valuing the property at $424,000 and a copy of the above note and the mortgage.

Turain also filed a proof of claim in which it asserted that it had a secured claim in the amount of $30,000. Among other things, a copy of the above agreement to sell restaurant equipment to debtor for $30,000 was attached to its proof of claim.

Seeking leave to return to state court to modify the amount of the judgment in foreclosure issued on October 12, 2004, the Casales brought a motion for relief from the automatic stay on August 5, 2005. In support of the motion, the Casales asserted that the real property had a value of $424,000. Attached to the motion was a copy of the same

appraisal they had attached to their proof of claim.  They further asserted that the total amount due under the note and mortgage was $596,521 plus interest and costs.

A modified order issued on August 30, 2005, granting the Casales relief from the automatic stay effective as of December 1, 2005.

The chapter 7 trustee subsequently commenced this adversary action against the Casales and Turain to determine the validity, extent and priority of their asserted liens.

Count I of the complaint is against the Casales.  The chapter 7 trustee asserts that, under the so-called merger doctrine, the above mortgage merged into and was extinguished by the judgment of foreclosure in the amount of $30,389.67 that issued on October 12, 2004.  As a result, the chapter 7 trustee maintains, the amount of the Casales' secured claim is at most $30,389.67 plus interest at the statutory rate and court costs.

Count II of the complaint also is against the Casales.  In it the chapter 7 trustee asserts that debtor did not receive reasonably equivalent value in exchange for the mortgage it granted the Casales.  As a result, the chapter 7 trustee continues, the above mortgage was fraudulent for purposes of PUFTA (as set forth at 12 Pa. C.S.A. §§ 5101 *et seq.*) and is avoidable to the extent that debtor did not receive reasonably equivalent value in return.

Count III of the complaint is against Turain. In it the chapter 7 trustee asserts that Turain is not a secured creditor because debtor never executed a security agreement in connection with the restaurant equipment Turain sold it.

The adversary action has been tried and is ready for decision.

- 7 -

## DISCUSSION

Various issues must be decided in this adversary action.

With respect to Count I, we must determine whether the merger doctrine or an exception to it applies with respect to the judgment in foreclosure issued on October 12, 2004. If the merger doctrine applies, the amount of the Casales mortgage lien is reduced to $30,389.67, the amount of the foreclosure judgment, plus interest and costs. The remainder of the lien is extinguished. If, on the other hand, an *exception* to the merger doctrine applies, the amount of the mortgage lien is not so limited.

The primary issue we must resolve with respect to Count II is whether debtor received reasonably equivalent value in return for the $600,000.00 mortgage it granted the Casales when they conveyed the real property to debtor. If debtor did receive reasonably equivalent value, the chapter 7 trustee cannot prevail under PUFTA. If debtor did not receive reasonably equivalent value, we will have to determine whether the other requirements of § 5104(a)(2) or § 5105 of PUFTA are satisfied.

The issue with respect to Count III of the complaint is whether, as the UCC-1 financing statement it filed suggests, Turain has an enforceable security interest in the restaurant equipment it sold to debtor.

### Count I: The Merger Doctrine

A judgment generally settles everything involved in one's right to recover.  Not only does it settle all the matters that were raised in the litigation, it also settles those matters that could have been raised in the litigation but were not. *Long v. Mann*, 360 Pa. 26, 27, 60 A.2d 35, 36 (Pa. 1948).

In the case of a mortgage, the merger doctrine provides that the terms of the mortgage are merged into the foreclosure judgment.  The mortgage no longer provides a basis for determining the respective rights and obligations of the parties. *Stendardo v. Federal National Mortgage Association (In re Stendardo)*, 991 F.2d 1089, 1095 (3d Cir 1993).  The judgment constitutes a "new and higher" obligation. 991 F.2d at 1098.  The original claim is extinguished; the rights and obligations that are based on the judgment are substituted in their place. 991 F.2d at 1099.

The merger doctrine as just characterized is not, however, a *per se* rule that applies invariably to every situation involving a mortgage and a foreclosure judgment.  A specific provision of a mortgage may survive the judgment if the mortgage clearly evidences an intention by the parties to preserve the effectiveness of that provision. 991 F.2d at 1095.

The amount of the foreclosure judgment issued on October 12, 2004, was $30,389.67 plus interest and costs.  This represented the amount that was due and owing *at that time* rather than the *accelerated* amount that was due and owing.

The chapter 7 trustee asserts that this is distinction is immaterial.  Whatever the amount that was *actually* due and owing under the mortgage, the chapter 7 trustee

- 9 -

asserts, the merger doctrine applies and the amount of the Casales' mortgage lien is limited to $30,389.67. Any right the Casales had to the remaining amount that was due under the mortgage was extinguished by the judgment. The Casales, in other words, are "stuck" with the amount set forth in the foreclosure judgment and may not now assert that the amount of their mortgage lien is greater than $30,389.67.

The Casales deny that the amount of their claim is so limited and raise two arguments in support of their position.

In the first argument, the Casales assert that the amount of the foreclosure judgment was *erroneous* and should have been for the entire amount due and owing under the note and mortgage because of debtor's default. They claim that their attorney at the time (or an associate of his) erred in asking only for the amount that was set forth in the judgment instead of the amount that was actually due and owing at the time.

As a consequence of this error, the Casales continue, they are *not* limited to the amount set forth in the foreclosure judgment because the above exception to the merger doctrine applies. They point to paragraph 24 of the mortgage and claim that the provision retained its vitality in spite of the judgment.

The Casales have the better argument here. An exception to the merger doctrine applies with respect to paragraph 24 of the mortgage. It remained operative notwithstanding the judgment and prevents the chapter 7 trustee from attempting to limit its amount to $30,389.67.

Because of ineptitude or for some other reason, the amount of the judgment of foreclosure was in fact the result of an error committed by the Casales attorney.[1] Instead of requesting the accelerated amount that was due under the mortgage and note, their attorney requested only the amount that was past-due when the judgment issued. The amount of the judgment that issued was only for what was past-due as of October 12, 2004.

The primary objective when construing a contract is to ascertain and give effect to the intent of the parties to the contract. *Murphy v. Duquesne University*, 565 Pa. 571, 590-91, 777 A.2d 418, 419 (Pa. 2001). If the contract is a written one, their intent is embodied in the writing itself. *Insurance Adjustment Bureau, Inc. v. Allstate Insurance Company*, 588 Pa. 470, 480, 905 A.2d 462, 468 (Pa. 2006).

Words not defined in the contract are to be given their "ordinary meaning". *Kripp v. Kripp*, 588 Pa. 82, 90, 849 A.2d 1159, 1163 (Pa. 2004). If the words of the contract are clear and unambiguous, one need not look beyond the written agreement to ascertain the parties' intent. 588 Pa. at 90, 849 A.2d at 1163. A contract is ambiguous if it is reasonably amenable to more than one construction and is capable of being understood in more than one way. 588 Pa. at 91, 849 A.2d at 1163.

A contract must be construed as a whole. The intent of the contracting parties must be determined from the entire contract, not detached portions of it. *Capek v. De Vito*, 564 Pa. 267, 273, 767 A.2d 1047, 1050 (Pa. 2001).

---

[1]. The Casales attorney at the time testified at trial that the error was made by an associate of his, whp it later was learned, was not licensed to practice law.

- 11 -

After reviewing the clear and unambiguous language of the mortgage instrument as a whole, we conclude that paragraph 24 of the mortgage retained its vitality; it was not "extinguished" by the foreclosure judgment. Debtor and the Casales intended for this provision to survive a foreclosure judgment under circumstances such as are presented here.

It follows that the chapter 7 trustee therefore must be treated as having waived the above error committed by the Casales' attorney in requesting and obtaining a judgment in the amount of $30,389.67. The merger doctrine does not apply.

The chapter 7 trustee disputes this conclusion. She asserts that the language of paragraph 24 speaks only of "errors in *proceedings* to enforce this Security Agreement". The Casales, the chapter 7 trustee continues, have not identified any defect or error in any *proceeding* to enforce their rights under the mortgage; they instead have identified an error *in the foreclosure judgment* itself. The latter, in other words, does not fall within the scope of the term "proceedings" as it appears in paragraph 24 of the mortgage.

This argument lacks merit. The assertion that an erroneous judgment, which was obtained in a foreclosure *proceeding*, does not itself qualify as an error that occurred in a *proceeding* for purposes of paragraph 24 is paradoxical, if not absurd. The word "proceeding" appearing in paragraph 24 is not reasonably susceptible to more than one interpretation in this context; the word must be given its ordinary meaning because it was not defined in the mortgage. An error in a determination of the amount due clearly appears to be an error in the proceedings to enforce the security agreement (mortgage).

- 12 -

Our discussion of Count I of the complaint does not end with this conclusion.

In their second argument in opposition to Count I of the complaint, the Casales offer another reason why their mortgage lien remained intact in spite of the judgment they obtained in the foreclosure proceeding.   A creditor with a mortgage lien on a debtor's property, they assert, does not lose the benefit of that lien but instead retains the right to enforce it even after obtaining a judgment based on the lien.[2]

Apparent support for this proposition can be found in § 462 of *American Jurisprudence 2d*, which provides in relevant part as follows:

> A lien securing a debt which becomes merged in a judgment generally is not
> affected by such merger .... [T]he merger of the judgment does not involve
> a merger of the lien and the latter may continue until the debt is satisfied ....
> If a creditor has a lien upon the property of the debtor and obtains a
> judgment against the debtor, the creditor does not thereby lose the benefit
> of the lien.  The judgment only changes the form of the action for recovery.
> The creditor retains the right to enforce a lien ... for the debt.  The reason
> for this rule is to avoid the obvious injustice of forcing ... the lienholder to
> lose its security preference by pursuing a claim to judgment.[3]

Courts from various jurisdictions other than Pennsylvania have applied the principle that a mortgage lien is not merged into a judgment of foreclosure and is not thereby extinguished. See, for instance, *Bank of Sun Prairie v. Marshall*, 242 Wis. 2d 355, 362, 626 N.W. 2d 319, 322 (Wis. 2001); *Albrecht v. Zwaanshoek En Financiering, B.V.*, 816 P.2d 808, 811-12 (Wyo. 1991); and *Brenton State Bank v. Tiffany*, 440 N.W. 2d 583, 586-87 (Iowa 1989).  This list is by no means exhaustive.

---

[2] We have determined that the merger doctrine does not apply here but will discuss this other assertion by the Casales in the interest of thoroughness.

[3] Similar language in support for this principle also is found at § 18, comment g, of the *Restatement (Second) of Judgments*.

The Casales have not cited to any decision by a Pennsylvania court that has adopted and applied the above principle to a case before it.  Our own research has not uncovered such a decision.  Perhaps this is because the issue has not been addressed by any state court in Pennsylvania.  We are not prepared at this time to predict what the Supreme Court of Pennsylvania would hold if the issue comes before it in the future.

The Casales, however, have pointed to decisions by the United States Court for the Third Circuit which, they claim, has applied the doctrine now under discussion.  The Casales primarily rely on statements made in *First National Fidelity Corporation v. Perry*, 945 F.2d 61, 66 (3d Cir 1991).  Their reliance on *Perry* is misplaced in at least two respects.

To begin with, *Perry* involved the application of New Jersey law, not Pennsylvania law.  Our concern at this point is with Pennsylvania law.

In addition, the discussion in *Perry* at 945 F.2d at 66 concerned whether a foreclosure *judgment* lien qualified as a security interest for purposes of § 1332(b)(2) of the Bankruptcy Code.  The Third Circuit was *not* addressing whether a *mortgage* lien remains in place after entry of a judgment based on that mortgage.  After considering the definition of "security interest" found at § 101(51) of the Bankruptcy Code, the court determined that a foreclosure *judgment* lien is the product of a consensual agreement and therefore qualifies as a security interest for purposes of § 1332(b)(2).  In the court's own words:

- 14 -

> Even though the contractual terms between the parties in this case have
> merged into the entry of a judgment of foreclosure, the security interest or
> lien continues to be the product of the consensual agreement between the
> debtor and lender.

945 F.2d at 64.

The Casales incorrectly interpret *Perry* as discussing the status of the *mortgage* lien rather than a *judgment* lien. Hence, *Perry* is inapposite and does not support for the second argument raised by the Casales with respect to Count I of the complaint.

We conclude in light of the foregoing considerations that the chapter 7 trustee cannot prevail on Count I of the complaint.

### Count II: PUFTA

The chapter 7 trustee maintains in Count II of the complaint that the $600,00.00 mortgage debtor granted the Casales when they conveyed the real property was a constructively fraudulent obligation for purposes of PUFTA (12 Pa. C.S.A. § 5101 *et seq.*) and therefore may be avoided.

Specifically, the chapter 7 trustee maintains that the obligation was fraudulent under 12 Pa. C.S.A. § 5104(a)(2) or § 5105.

Section 5104 of PUFTA provides in part as follows:

> **(a) General rule. —–** A[n]...obligation incurred by a debtor is ... fraudulent
> as to a creditor, whether the creditor's claim arose before or after the ...
> obligation was incurred, if the debtor incurred ... the obligation:....
>> (2) without receiving a reasonably equivalent value in exchange for
>> the ... obligation, and the debtor:
>>> (I) was engaged or was about to engage in a business ... for
>>> which the remaining assets of the debtor were unreasonably
>>> small in relation to the business ... ; or

- 15 -

> (ii) ... believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa. C.S.A.  § 5104(a)(2)(Purdon's 2003).

Section 5105 of PUFTA provides in part as follows:

> A[n] obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before ... the obligation was incurred if the debtor ... incurred the obligation without receiving a reasonably equivalent value in exchange for ... the obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the ... obligation.

12 Pa. C.S.A. § 5105 (Purdon's 2003).

Both of these sections of PUFTA share a requirement in common: the debtor did not receive a reasonably equivalent value in exchange for the incurred obligation, in this case the $600,00.00 mortgage it granted the Casales.  How the phrase "reasonably equivalent value" is to be understood is left unsaid in PUFTA.

The language in these provisions mirrors and was patterned after § 548 of the Bankruptcy Code, which provides in part as follows:

> (a)(1) The trustee may avoid ... any obligation incurred by the debtor ... if the debtor voluntarily or involuntarily –....
>
> > (B)(i) received less than a reasonably equivalent value in exchange for ... such obligation; and
> >
> > > (ii)(I) was insolvent on the date such ... obligation was incurred, or became insolvent as a result of such ... obligation;
> > >
> > > (II) was engaged in a business ..., or was about to engage in a business ..., for which any property remaining with the debtor was an unreasonably small capital;
> > >
> > > (III) intended to incur, or believed that the debtor would incur debts that would be beyond the debtor's ability pay as such debts matured...

11 U.S.C. § 548(a)(1)(B).

- 16 -

Common to both PUFTA and § 548(a) of the Bankruptcy Code is the phrase "a reasonably equivalent value".  Because the phrase as it is used in PUFTA is patterned after its use in § 548(a) of the Bankruptcy Code, we may look to interpretations of the phrase as it appears in the latter to understand its use in the former.  *Hemstreet v. Brostmeyer (In re Hemstreet)*, 288 B.R. 134, 139 (Bankr. W.D. Pa. 2001).

Of the three words comprising the phrase "reasonably equivalent value" in § 548(a), only the last is defined.[4]    For purposes of § 548(a), "value" means "property, or satisfaction or securing of a present or antecedent debt of the debtor". 11 U.S.C. § 548(d)(2)(A).  Congress left it to the courts to delineate the scope and meaning of the phrase as a whole. *Mellon Bank, N.A. v. The Official Committee of Unsecured Creditors of RML., Inc. (In re RML, Inc.)*, 92 F.3d 139, 148 (3d Cir 1996).

The chapter 7 trustee does not dispute that debtor received some value from the Casales in exchange for the $600,000.00 mortgage.  At a minimum, debtor received real property which, if the trustee is correct, had a value of $400,000 to $424,000 when debtor granted the mortgage.  The trustee's contends that the value of the real property was not "reasonably equivalent" to the amount of the mortgage.

What has to be determined for purposes of Count II is whether debtor received "roughly the value it gave". *Pension Transfer Corporation v. Beneficiaries Under the Third Amendment to Freuhauf Trailer Corporation Retirement Plan No. 003 (In re Freuhauf)*, 444 F.3d 203, 212-13 (3d Cir 2006).

---

[4.]  None of the terms is defined in PUFTA.

The totality of the circumstances surrounding the transaction must be considered when determining whether the value of what debtor received was reasonably equivalent to the value it gave. *In re RML, Inc.*, 92 F.3d at 153.

Such circumstances include: (1) the fair market value of what the debtor received; (2) whether an arm's-length relationship existed between debtor and the Casales; and (3) whether the Casales, as transferees, acted in good faith. 92 F.3d at 148-49.

The chapter 7 trustee limited herself in connection with Count I to attempting to prove that the fair market value of what debtor received was considerably less than the $600,000 mortgage. She did not address factors (2) and (3) or, for that matter, any other circumstance surrounding the transaction.

According to the chapter 7 trustee, the fair market value of the real property when the closing took place was $400,000 to $424,000. This assertion as to value is based on two considerations.

First, the chapter 7 trustee points to the Casales' motion for relief from stay, which was granted on August 30, 2005, wherein they maintained that the real property had a value of $424,000. Attached to their motion was an appraisal stating that the property was worth this amount on January 1, 2005, approximately one year after the closing took place. In addition, the chapter 7 trustee relies on another appraisal that was prepared at her request which stated that the property was worth $400,000 to $424,000 on January 7, 2004, the date on which the closing took place.

- 18 -

The chapter 7 trustee did not explain the significance of what the Casales claimed was the value of the property in their motion for relief from the automatic stay. Without saying so, the chapter 7 trustee seems to maintain that the Casales are now *judicially estopped* from claiming in this matter that the property is worth more than $424,000.

Federal courts have inherent equitable power to sanction a litigant's malfeasance. Judicial estoppel is one such sanction. *Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir 2000). The purpose of judicial estoppel is to protect the integrity of the court. *Klein v. GMBH & Co. Maschinefabrik*, 185 F.3d 98, 109 (3d Cir 1999). It should be applied only sparingly to avoid a miscarriage of justice. *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corporation*, 337 F.3d 314, 319 (3d Cir 2003), *cert. denied*, 541 U.S. 1043, 124 S.Ct. 2172, 158 L.Ed.2d 732 (2004).

Three requirements must be satisfied for judicial estoppel to apply: (1) the party to be estopped must have taken irreconcilably different positions in different proceedings; (2) the party to be estopped must have changed its position in bad faith – i.e., with intent to "play fast and loose" with the court; and (3) no lesser sanction would remedy the damage done by that party's misconduct. *Montrose Medical Group*, 243 F.3d at 781.

Judicial estoppel frequently is the harshest sanction a court can impose on a litigant. 243 F.3d 781. It may be employed only when it is tailored to address some identified harm. 243 F.3d at 779-80.

The Casales are not judicially estopped from denying in this proceeding that the real property is worth at most $424,000.

- 19 -

To the extent that their position in this matter may be irreconcilable and inconsistent with the assertion in their motion from relief from the automatic stay that the property is worth $424,000, we are satisfied that they are *not* acting in bad faith in denying in this proceeding that the property is worth at most $424,000.  By so denying, they simply are demanding affirmative proof by the chapter 7 trustee that the property is worth $400,000 to $424,000.  The Casales are not playing "fast and loose" with the court.

Judicially estopping the Casales from denying that the property at most is worth $424,000 would be an unduly harsh sanction.  So doing would effectively prevent the Casales from denying that the mortgage is avoidable in accordance with § 5104(a)(2) of § 5105 of PUFTA.  Justice will be better served if the Casales are allowed to "put the trustee to the test" and require her to prove Count II.

The affirmative proof offered by the chapter 7 trustee concerning the value of the property was based in large measure on an appraisal of the property done at her request, which claims that the property was worth $424,000 to $400,000 on January 7, 2004.  The appraiser's estimate as to the value of the property was based on: (1) his "familiarity with the property"; and (2) on the appraisal the Casales submitted in support of their earlier motion for relief from the automatic stay.

It should be noted at the outset that, for reasons unknown, the individual who prepared the appraisal for the chapter 7 trustee was not called to testify at trial.  Without his live testimony and the opportunity for the Casales to cross-examine him, we have no

basis for finding persuasive his opinion concerning the value of the property as of January 7, 2004.

The same broker was employed by the chapter 7 trustee to locate a buyer for the property when she attempted, without success, to sell the property in this court. The sale was not confirmed because we were previously led to believe that the property was worth considerably more than $385,000.

The broker's "familiarity with the property" was based on his inability to locate a potential buyer willing to offer more than $385,000 for the property. His reliance on this fact is not persuasive. A sale in bankruptcy court is akin to a "fire sale" and frequently fetches a purchase price that frequently is less, sometimes significantly so, than the property would fetch outside of bankruptcy in an arm's-length transaction. The offer of the would-be buyer located by the broker to pay $385,000 undoubtedly was a "low-ball" offer in comparison to what the property truly was worth on January 7, 2004.

The problems with the first rationale for the purported value of the property do not end with this. The agreement of sale between the chapter 7 trustee and the would-be purchaser was executed on January 13, 2006, approximately twenty months after debtor permanently closed its restaurant early in May of 2004 and abandoned the premises. The Casales, who regained possession of the property shortly after debtor abandoned it, made no effort to maintain the property and preserve its value. One could safely infer under such circumstances that real property that had lain unoccupied for so long would be worth considerably less some twenty months later.

The second basis for the claimed value of the property upon which the chapter 7 trustee relies fares no better than does the first. The individual who had appraised the

property and asserted that it was worth $424,000 also did not testify at trial.[5]   Reliance

upon what the Casales appraiser asserted in his *written* appraisal for the truth of what the

property was worth on January 7, 2004, is inadmissible hearsay.   Even if it were

admissible, the stated value of the property was supposedly true as of January of 2005,

one year after the closing on the sale took place and seven months after debtor had

abandoned the property.   It again would be reasonable under the circumstances to infer

that the property was worth less in January of 2005 than it was worth in January of 2004.

In addition to failing to satisfactorily demonstrate that the fair market value of the

property was $400,000 to $424,000 at the relevant time, the chapter 7 trustee failed to

prove that the other two requirements were satisfied. See *In re RML*, 92 F.3d at 148-49.

That is to say, the chapter 7 trustee offered no proof concerning whether the

transaction between debtor and the Casales was or was not an arm's-length transaction.

In addition, she failed to prove that, as transferees of the $600,000 mortgage, the Casales

acted in bad faith.   Her failure to so prove also is fatal to Count II of the complaint.

What evidence was presented at trial indicates that the transaction between debtor

and the Casales was in fact done at arm's-length.   The option to purchase the property at

a specified price was set forth in the lease agreement between Gourmet Products and the

Casales.   Debtor had not yet been incorporated when the agreement was negotiated and

obviously played no role in negotiating the lease agreement.   There is no reason to doubt

---

[5.]   This did not inure to the detriment of the Casales because they do *not* have the burden
of proof in this case concerning the value of the property on January 7, 2004.  The burden
lies with the chapter 7 trustee to prove that debtor did not receive "reasonably equivalent
value" in return for the $600,000 mortgage it granted the Casales.

that the lease agreement between Gourmet Products and the Casales was an arm's-length transaction.

That same evidence also indicates that the Casales did not act in bad faith in agreeing to convey the property to debtor in return for the $600,000 mortgage they received. Irrespective of the actual value of the real property, the Casales (and debtor) subjectively and reasonably believed that the purchase price was reasonable and that a mortgage in the amount of $600,000 was appropriate to secure payment of the unpaid balance of the purchase price. We have no good reason to conclude otherwise.

It follows from the foregoing that Count II of the complaint must fail and that the chapter 7 trustee consequently cannot avoid as a fraudulent transfer the $600,000 mortgage granted by debtor.

### Count III: Turain's Security Interest

Debtor and Turain executed an agreement of sale on January 7, 2004. They agreed that debtor would purchase from Turain for $30,000 certain equipment in the restaurant.

At some unspecified time soon after January 7, 2004, Turain filed a UCC-1 financing statement indicating that it had a security interest in the property.

After debtor filed its bankruptcy petition, Turain filed a proof of claim in which Turain asserted that it had a secured interest in the restaurant equipment in the amount of $30,000. Attached to its proof of claim was: a schedule of restaurant equipment; a copy of the agreement of sale into which debtor and Turain had entered; correspondence between the Casales' attorney at the time and one of debtor's principals; and notes of an attorney, whose relationship to either party is not clear, which refer to a security

agreement pertaining to the equipment. Neither a written security agreement nor a copy of the UCC-1 financing statement was attached to the proof of claim.

The chapter 7 trustee in Count III of the complaint contests the enforceability of the lien Turain claims it has.  She maintains  that debtor never executed a security agreement in favor of Turain and requests a determination that Turain does not have a secured interest in any of the restaurant equipment.

To no one's surprise, Turain insists that it has a valid and enforceable secured interest in the restaurant equipment it sold to debtor.

We must look to state law, in this instance the law of Pennsylvania, to determine whether a claim asserted by a creditor in a bankruptcy proceeding is secured. *Cohen v. KB Mezzanine Fund II (In re Submicron Systems Corporation)*, 432 F.3d 448, 458 (3d Cir 2006).

Section 9203 of the Uniform Commercial Code enacted in Pennsylvania provides as follows:

> **(b) Enforceability.** -- …[A] security interest is enforceable against the debtor and third parties with respect to the collateral only if all of the following apply:
>     (1) Value has been given.
>     (2) The debtor has rights in the collateral ….
>     (3) One of the following conditions is met:
>         (I) The debtor has authenticated a security agreement which provides a description of the collateral ……

13 Pa. C.S.A.  § 9203 (Purdon's 2003).

Requirements (b)(1) and (b)(3)(I) are not satisfied in this instance.

The chapter 7 trustee and Turain stipulated for purposes of trial that debtor paid Turain the *entire* purchase price of $30,000 at the closing on January 7, 2004.  We are at

a loss in light of this stipulation to understand Turain's insistence that it has an enforceable security interest in the equipment. It directly follows from this stipulation that Turain did not have a security interest in the equipment it sold to debtor, let alone one that was enforceable for purposes of § 9203 of the Uniform Commercial Code.

Two things generally are required under Article 9 of the Uniform Commercial Code to create an enforceable security interest in collateral.

There first must be a *security agreement* giving the creditor an interest in the collateral. The minimal requirements for such a security agreement to exist are: (1) a writing; (2) signed by the debtor; and (3) which contains a description of the collateral or types of collateral. *In the Matter of Bollinger Corporation*, 614 F.2d 924, 926 (3d Cir 1980).

In addition to a security agreement, there also must be a financing statement which is: (1) signed by both parties and (2) is filed of record. 614 F.2d at 926.

Turain produced nothing at trial showing that a security agreement and a proper financing statement ever existed.

Turain implicitly concedes that there was no *written* security agreement, as required by § 9203(b)(1) of the Uniform Commercial Code, but nonetheless insists that a security agreement existed. As support for its position, Turain points to the following language in *Matter of Bollinger Corporation*:

> When the parties have neglected to sign a separate security agreement, it would appear that the better and more practical view is to look at the transaction as a whole in order to determine if there is a writing, or writings, signed by debtor describing the collateral, which demonstrates an intent to create a security in the collateral.

614 F.2d at 928.

Relying on this language, Turain points to attachments affixed to its proof of claim which it maintains establish that debtor had agreed to grant Turain a security interest in the restaurant equipment it sold to debtor.

Only two of these attachments were signed on debtor's behalf.  They are: (1) the agreement of sale for the equipment, which was signed by debtor's president; and (2) a letter to Turain's then-counsel from an attorney who apparently represented debtor at the closing.  Because they were not signed on behalf of debtor, the other attachments are not probative with respect to whether debtor intended to grant Turain a security interest in the equipment.

The agreement of sale says nothing about debtor agreeing to grant Turain a security interest in the equipment debtor was purchasing from Turain.  It is silent on this point and therefore gives no indication that debtor agreed to grant Turain such a security interest.

As for the letter from an attorney who apparently represented debtor at the closing, the attorney states that he was "looking to receive" a copy of the security agreement and the UCC-1 financing statement.  While one might construe this statement as implying that debtor had intended to grant Turain a security interest, the letter does not identify the collateral or types of collateral in which Turain would have a security interest.  The third of the above requirements for a security agreement to exist, in other words, is not satisfied with respect to this letter. See *Matter of Bollinger Corporation*, 614 F.2d at 926.

Not only is there nothing in the record created at trial to warrant the conclusion that debtor agreed to grant Turain a security interest in the equipment it purchased from

Turain, there is nothing in that record which establishes that Turain filed a *proper* UCC-1 financing statement.

Turain did not produce at trial a copy of the UCC-1 financing statement that Turain claims it filed.  As a result of this omission, there is no basis for concluding that *debtor* signed the UCC-1 financing statement.  That is to say, the second of the requirements for there to be an enforceable security interest was not present.

We conclude in light of these considerations that, for purposes of § 9203 of the Uniform Commercial Code, Turain did not have an enforceable security interest in the restaurant equipment debtor purchased from it on January 7, 2004.  The chapter 7 trustee therefore must prevail against Turain under Count III of the complaint.

An appropriate order shall issue.

**BERNARD MARKOVITZ**
U.S. Bankruptcy Judge

Dated: February 22, 2008

**FILED**

**FEB 22 2008**

CLERK, U.S. BANKRUPTCY COURT
WEST. DIST. OF PENNSYLVANIA

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| **PHILLIPS GROUP, INC. d/b/a** | : | **Bankruptcy No. 05-23166 BM** |
| **LA RECETTE ON THE RIVERS EDGE,** | : | |
| | : | |
| Debtor | : | **Chapter 7** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| **NATALIE LUTZ CARDIELLO, TRUSTEE,** | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | **Adversary No 05-3051 BM** |
| | : | |
| **PHILIP CASALE and LORRAINE** | : | |
| **CASALE, and TURAIN ENTERPRISES,** | : | |
| **INC.,** | : | |
| | : | |
| Defendants | : | |

## ORDER OF COURT

**AND NOW**, this **22nd** day of **February**, 2008, for reasons set forth in the accompanying memorandum opinion, it hereby is **ORDERED**, **ADJUDGED** and **DECREED** that:

(1) **JUDGMENT** be and hereby is entered **IN FAVOR OF** Phillip and Lorraine Casale and **AGAINST** the chapter 7 trustee with respect to Count I and Count II of the complaint; and

(2) **JUDGMENT** be and hereby is entered in entered **IN FAVOR OF** the chapter 7 trustee and against Turain Enterprises, Inc. with respect to Count III of the complaint. Turain Enterprises does **NOT** have an enforceable security interest in the restaurant equipment debtor purchased from it.

It is **SO ORDERED**.

FILED

**BERNARD MARKOVITZ**
U.S. Bankruptcy Judge

FEB 22 2008

cm: Parties in interest